# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES,

v.                                          Case No: 8:22-cr-78-KKM-MRM

PATRICK DINES,

_____

## ORDER

In December 2022, a jury convicted Patrick Dines of obstructing a Coast Guard proceeding. At the close of the government's case, Dines moved for a judgment of acquittal under Rule 29(a), and renewed it after the close of all evidence. *See* Trial Tr. Vol. III (Doc. 169) at 266. I denied his first motion but reserved ruling on his renewed motion and permitted Dines to submit supplemental briefing following the verdict. *See* Oral Order Scheduling Deadlines (Doc. 158). Dines also moves for a judgment of acquittal under Rule 29(c). *See* Def.'s Mot. for J. of Acquittal (Doc. 177). Dines submitted briefing on both motions and the government responded in opposition. *See* Def.'s Suppl. Br. to Mot. for J. of Acquittal (Doc. 173); Resp. in Opp'n to Def.'s Suppl. Br. (Doc. 176); Def.'s Mot. for J. of Acquittal; Resp. in Opp'n to Def.'s Mot. for J. of Acquittal (Doc. 179). Because Dines fails to show that the evidence is insufficient to sustain a conviction, I deny both motions.

## I.   BACKGROUND

The government charged Dines with a single count of obstructing a Coast Guard proceeding by encouraging witnesses to provide false information material to that investigation, in violation of 18 U.S.C. § 1505. *See* Indictment (Doc. 1). The charged conduct arose from a marine casualty investigation that the Coast Guard initiated on March 14, 2017, after a passenger and crewmember were swept out to sea during the charter of the *Jaguar* through Dines's company FYC Yachts. The government presented evidence at trial from Coast Guard investigators, captains who formerly worked for FYC Yachts, and passengers who were aboard the *Jaguar* on that date.

Coast Guard officials received complaints that Dines overcrowded his yachts, and Investigator Brian Knapp met with Dines in August 2016 to warn him that he could not exceed passenger limits on charter vessels under Coast Guard regulations. Trial Tr. Vol. II (Doc. 168) at 74. Three captains who had previously worked for Dines testified that Dines had coached them to misidentify passengers as crewmembers to avoid the Coast Guard investigating overcrowded charters. Trial Tr. Vol. I (Doc. 167) at 232–35, 251–52, 258; Vol. II at 28–30.

Coast Guard officials testified that the number of passengers and crew on each charter matters because it impacts aspects of marine casualty investigations by the Coast Guard such as licensing, vessel capability, safety of the vessel, and the Coast Guard's

2

determination of whether the boat was operating as an illegal charter. Trial Tr. Vol. II at 66–72, 232–35; Vol. III (Doc. 169) at 15, 20–23, 26–27.

Coast Guard officer Kevin Coyne testified that—at 6:10 p.m. on March 14, 2017— the Coast Guard received a call forwarded from 911 dispatchers that two people were struggling in the water. Trial Tr. Vol. II at 228. The Coast Guard immediately began collecting information about the incident. *Id.* at 229. Coast Guard officer Ronald Gleason testified that the marine casualty investigation began at 6:10 p.m. when the Coast Guard received the call, and he was assigned to the case at 8:47 p.m. on the evening of March 14. Trial Tr. Vol. III at 25. He then went to the marina to meet the vessel around 9:20 p.m. *Id.* at 17.

Abbie Teoh and Ian Cheng were among the fifteen college students aboard the *Jaguar* during the charter on March 14, 2017. Trial Tr. Vol. II at 114, 199, 200. Teoh is from Malaysia and Cheng is from Taiwan. *Id.* at 199, 112. Cheng had reserved the *Jaguar* and communicated with FYC Yachts to arrange the trip. *Id.* at 116, 138. The boat left the dock around 3 p.m. and later anchored offshore to allow the students to go swimming. *Id.* at 122. Several students began jumping off the back of the boat and swimming back, but some noticed a strong current pulling them away from the boat. *Id.* at 124–25. Two students struggled to swim back to the boat and Cheng jumped in to assist one of them with a life vest. *Id.* at 128–29, 133. Crewmember Andrew Dillman, an employee of FYC

yachts, dove into the water to assist Roger, the other struggling student. *Id.* at 129, 133–35. But the captain lost sight of both Dillman and Roger and the two were swept out to sea. *Id.* at 134. After the captain called 911, the Coast Guard sent a crew to meet the *Jaguar* and the Coast Guard crew accompanied the *Jaguar* back to the dock at Maximo Marina. *Id.* at 135–36. Cheng and Teoh testified that Dines then came to the dock and spoke with them around 9 p.m. Trial Tr. Vol. II at 137, 211. Dines also testified that he went to the dock the night of March 14 "at dark" when the *Jaguar* was "just coming in" or had "already moored" because he was notified that "there was an incident" and he knew "it must be something serious." Trial Tr. Vol. III at 222. When Dines arrived, he observed that law enforcement was "already on board." *Id.*

Cheng testified that Dines had a "private" conversation with him in which Dines asked Cheng "is there any opportunity we can provide or have another crew member in the group of 15 of us." Trial Tr. Vol. II at 138. Cheng was "really confused" by the question because he thought that he had "no duty to become a crew member," so he asked Dines "several times" why "we should be one of the crew member." *Id.*  On cross examination, Cheng admitted that Dines "didn't like, really ask me to be a crew member, but he was asking, like the question if it's possible to have the crewmember." *Id.* at 176. He also agreed with his previous deposition testimony that Dines asked him: "can I be crewmember? When the police come, just say you are one of the crew members." *Id.* at 177.

4

Cheng also testified that Dines asked him about whether he had signed a contract before the trip. *Id.* at 140. Dines "presented" Cheng with a charter agreement from Andrew Dillman's bag but for a different charter; Cheng could not recall if Dines asked him to sign it. *Id.* at 141–42. Because it had information about a different charter on it, Cheng "didn't sign that contract." *Id.* at 141. Cheng took a picture of Dines's business card at the end of their conversation at 9:11 p.m. *Id.* at 145; Trial Tr. Vol. III at 24. Cheng received a "new contract" with "the correct information via e-mail around 9:30" that evening from Dines's employee Larae Leeson. Trial Tr. Vol. II at 144; Trial Tr. Vol. III at 67. After reviewing his 2019 deposition, he agreed with Dines's counsel that he previously stated that Dines "didn't" ask him to sign any documents. *Id.* at 178–79.

After the government rested its case, Dines moved for a judgment of acquittal under Rule 29(a), arguing that the government had failed to prove any of the essential elements of the charge beyond a reasonable doubt. *See* Trial Tr. Vol. III at 39. Dines renewed his motion at the close of all evidence and argued that (1) there was "no evidence . . . that shows an investigation into an illegal charter was ongoing when Mr. Dines arrived at the dock;" (2) there was no evidence "that Dines knew that a marine casualty investigation started;" (3) the evidence was insufficient to show that "Mr. Dines tried to get Mr. Cheng to sign a charter agreement," or that Dines "asked Mr. Cheng to lie;" and (4) there was no

evidence that Dines's actions would have the natural and probable effect of affecting the Coast Guard investigation. *See* Trial Tr. Vol. III at 41, 42–43, 46–47, 50–51.

I denied Dines's original motion and took Dines's renewed motion under advisement and allowed the parties to submit supplemental briefing after trial. *See* Trial Tr. Vol. III at 74; Order Scheduling Deadlines. Dines filed a 56-page supplemental brief, and the government filed a 17-page response in opposition. *See* Def.'s Suppl. Br.; Resp. in Opp'n. Following the verdict, Dines also moved for judgment of acquittal under Rule 29(c). *See* Def.'s Mot. for J. of Acquittal (Doc. 177). The government responded in opposition. Resp. in Opp'n to Def's Mot. For J. of Acquittal.

## II.   LEGAL STANDARD

Rule 29(a), FED. R. CRIM. P., provides that, "[a]fter the government closes its evidence, or after the close of all the evidence," the trial court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The Court must determine "whether the relevant evidence, viewed in the light most favorable to the government, could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a

reasonable doubt." *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979).[1] The Court

must accept "[a]ll reasonable inferences which tend to support the Government's case." *Id.*

Rule 29(c), FED. R. CRIM. P., provides that the trial court "may set aside the verdict

and enter an acquittal" after the court discharges the jury. The Court must use "the same

standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United*

*States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). "When a jury finds a defendant

guilty, its verdict must stand if '*any* rational trier of fact could have found the *essential*

elements of the crime beyond a reasonable doubt.' " *United States v. Brenson*, 104 F.3d

1267, 1275 (11th Cir. 1997) (quoting *United States v. Saget*, 991 F.2d 702, 711 (11th Cir.

1993)) (emphasis in original)). Only "if a reasonable jury must necessarily entertain a

reasonable doubt as to the defendant's guilt," must the court reverse the conviction. *United*

*States v. Thomas*, 916 F.2d 647, 653 (11th Cir. 1990). In considering a motion for

judgment of acquittal, the Court may not "assess the credibility of witnesses, weigh the

evidence, or substitute its own judgment as to the guilt or innocence for that of the jury."

*Burns*, 597 F.2d at 941–42 (internal quotations omitted). Here, as under Rule 29(a), the

Court must view the evidence in the light most favorable to the government, accept all

reasonable inferences that tend to support the government's case, and resolve any conflicts

---

[1] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of
Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d
1206, 1207 (11th Cir. 1981) (en banc).

in the evidence in favor of the government. *Ward*, 197 F.3d at 1079. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Thomas*, 916 F.2d at 653.

## III.  ANALYSIS

To prove obstruction of a Coast Guard proceeding under 18 U.S.C. § 1505, the government had to prove beyond a reasonable doubt that (1) there was a pending proceeding; (2) Dines knew of the pending proceeding; and (3) Dines corruptly tried to influence, obstruct, or impede the due administration of justice in that agency proceeding. *See United States v. Taohim*, 817 F.3d 1215, 1220 (11th Cir. 2013). To satisfy the nexus requirement of the third element, the government also had to prove beyond a reasonable doubt that "the defendant corruptly took some action, the natural and probable effect of which would be to obstruct or impede" an agency proceeding. *Brenson*, 104 F.3d at 1280.

I address each of Dines's motions for judgment of acquittal in turn, concluding that the evidence submitted at trial requires that both of Dines's motions be denied.

### A.  Rule 29(a) Motion

Dines argued at trial that the government failed to meet its burden to prove any of the charge's essential elements beyond a reasonable doubt. In his supplemental brief, he focuses on two specific concerns: (1) that no reasonable jury could find beyond a reasonable doubt that Dines asked Cheng to sign a charter agreement, and (2) that no reasonable jury

8

could find beyond a reasonable doubt that the natural and probable effect of Dines's actions would be to sway, change, or prevent some agency action. *See* Def.'s Suppl. Br. to Mot. for J. of Acquittal at 1. I analyze the sufficiency of the evidence for each element and address each of Dines's arguments under the relevant elements.

### 1. Pending Proceeding

Dines argued at trial that no reasonable jury could find that there was a pending proceeding at the time of the alleged conduct: "There is no evidence pre-indictment, documentary or otherwise, that shows an investigation into an illegal charter was ongoing when Mr. Dines arrived at the dock." Trial Tr. Vol. III at 41. Dines argued that any evidence showing there was a pending proceeding was provided "post-indictment, post-conferral with the Government." *Id.* Dines attempted to distinguish between the search and rescue investigation and the marine casualty investigation and argued that the search and rescue investigation began when the *Jaguar* called the Coast Guard around 6 p.m. on March 14, but that the marine casualty investigation was "separate" and began sometime after Dines came to the docks. *Id.* at 42.

The government responds that the marine casualty investigation began when the Coast Guard command center received the call from the *Jaguar* at 6:10 p.m. on March 14. *See id.* at 63; Resp. in Opp'n to Def.'s Suppl. Br. (Doc. 176) at 3. The government points

to testimony from Coast Guard officials Kevin Coyne and Ronald Gleason that, consistent with their training and experience, the investigation began with the 6:10 p.m. call. *Id.* at 4.

I previously ruled that a marine casualty investigation is an agency proceeding for purposes of 18 U.S.C. § 1505. *See* Order Den. Mot. to Dismiss (Doc. 61). I also defined "marine casualty investigation" for the jury as "an agency proceeding" that "applies to events caused by or involving a vessel" including "[a]ny fall overboard, injury or loss of life of any person, or any other circumstance that might affect or impair a vessel's seaworthiness, efficiency or fitness for service or route." *See* Court's Instructions to the Jury (Doc. 160) at 17. I also instructed that such an investigation "can include an investigation into whether a vessel was being operated as an illegal charter." *Id.*

The government provided two Coast Guard witnesses involved in investigating the March 14 incident. Command Duty Officer Kevin Coyne testified that, upon receiving the call from the *Jaguar*, he began collecting additional information including where the boat was, how many people were on the boat, and what the boat's capabilities were. Trial Tr. Vol. II at 232. Coast Guard officer Ronald Gleason testified that he was assigned the case at 8:47 p.m. and that he relied on the information "initially collected by the Coast Guard command center" to begin his investigation. Trial Tr. Vol. III at 25. He understood that the marine casualty investigation began "[w]ith the call the command center received" at 6:10 p.m. that evening. *Id.*

Dines himself testified that he came to the docks "at dark" when the *Jaguar* was "just coming in" or had "already moored." *Id.* at 222. When asked whether law enforcement was "already on board," Dines replied "Yes, they were." *Id.* Both Dines and Cheng testified that Dines then spoke to Cheng on the *Jaguar. See id.* at 226; Trial Tr. Vol. II at 137. The government also submitted into evidence a photo timestamped 9:11 p.m. that Cheng took that evening when Dines handed him a business card at the close of their conversation. Trial Tr. Vol. III at 24. The testimony of Coast Guard officers Coyne and Gleason that they received a call at 6:10 p.m., that Officer Gleason was assigned the case at 8:47 p.m., and the timestamped photo taken at the end of Dines's conversation with Cheng provide sufficient evidence that a reasonable jury could find that there was a pending agency proceeding when Dines spoke to Cheng on the *Jaguar* on March 14, 2017.

## 2. Knowledge of a Pending Proceeding

Dines argued at trial that there was insufficient evidence that "Mr. Dines knew there was a pending Coast Guard investigation" at the time of his actions. *Id.* at 268. Dines argued that the government offered no evidence to show that Dines "knew that Coast Guard investigations start immediately when boarded." *Id.*

The government responds that it presented sufficient evidence for the jury to make the "reasonable inference" that Dines knew "of the pending Coast Guard proceeding" when he met the *Jaguar* at the dock. Resp. in Opp'n to Def.'s Suppl. Br. at 6–11. The government

highlights Dines's meeting and correspondence with Coast Guard officer Knapp in 2016, when Knapp apprised Dines of Coast Guard procedure and specifically put Dines on notice that "the Coast Guard enforced demise/bareboat charter rules and investigated instances of noncompliance." *Id.* at 6–7. The government also points to evidence from the three charter boat captains who worked for Dines and FYC Yachts previously and who testified that Dines had instructed them to lie to Coast Guard officials in the event of a boarding. *Id.* at 8–9. The government contends that "[t]his testimony shows that the defendant knew the Coast Guard boarded in-progress charters and investigated issues of vessel passenger size and overcrowding." *Id.* at 8. The government also points to Cheng and Teoh's testimony that law enforcement officers were onboard the *Jaguar* when Dines arrived and Dines offered condolences to the students. *Id.* at 9–10. The government argues that this "reinforces the strong inference that the defendant knew a Coast Guard investigation was underway when he approached Cheng and other passengers on the evening of March 14, 2017." *Id.* at 10. Finally, the government points to Dines's testimony about his "considerable experience in the maritime realm," and argues that Dines "had a deep understanding of yacht charter operations and knowledge that the Coast Guard oversees compliance with the rules governing such operations." *Id.* at 10.

Of course, there is no direct evidence of Dines's state of mind at the time he approached Cheng and the other students. But the government presented ample evidence

from which a reasonable jury could infer that Dines knew a Coast Guard proceeding was in progress when he boarded the *Jaguar* on March 14, 2017. First, the uncontroverted testimony from Cheng and Teoh indicates that there were law enforcement agents on the *Jaguar* when Dines arrived at the dock. Trial Tr. Vol. II at 137, 210. This fact, coupled with Dines's conversations with Coast Guard investigator Knapp about how the Coast Guard conducts investigations and Dines's own extensive experience with the Coast Guard provide sufficient evidence that a reasonable jury could conclude beyond a reasonable doubt that Dines knew there was a pending Coast Guard proceeding when he approached the students at the dock. If that were not enough, the government provided additional evidence from captains who worked for Dines and had received instruction from him on how to avoid Coast Guard investigations. *See* Trial Tr. Vol. I at 232–35, 251–52, 258; Trial Tr. Vol. II at 28–30. This testimony provides further indication that Dines was aware of how Coast Guard investigations occurred and would have known that there was an investigation in progress when he came to the dock in response to reports of a serious incident on a charter yacht.

### 3.  Corruptly tried to influence, obstruct, impede the Proceeding

Dines argued at trial that there was insufficient evidence for a reasonable jury to find that he intentionally endeavored to corruptly influence, obstruct, or impede the pending proceeding. Trial Tr. Vol. III at 268. Under this element, Dines makes two arguments that

he bolsters in his supplemental brief. Dines argues that no reasonable jury could find (a) that Dines instructed Mr. Cheng to lie about the number of passengers and crew, or (b) that he attempted to get Mr. Cheng to sign a charter agreement after the incident. *Id.* at 269–71; Def.'s Suppl. Br. to Mot. for J. of Acquittal at 10–16.

Regarding the crewmember-count theory of guilt, Dines argued at trial that the only evidence the government presented to show that Dines instructed Cheng to lie about being a crewmember was Cheng's "unclear" testimony, contradicted by Dines's testimony that he "did not do so." Trial Tr. Vol. III at 270. Regarding the contract theory of guilt, Dines contends that the government merely proved that Dines "presented Mr. Cheng" with a contract, but that Dines denied asking him to sign it. Moreover, Dines's expert witness, Mr. Pope, testified that a charter agreement need not be in writing. *Id.* at 271. Dines contends that the government must show that Dines "probably asked Cheng to sign the charter agreement" because the government asked the jury to make a reasonable inference. Def.'s Suppl. Br. to Mot. for J. of Acquittal at 17. Dines emphasizes the government's need to provide more evidence to show a reasonable inference, citing to *United States v. Belt,* 574 F.2d 1234, 1235 (5th Cir. 1978). Dines argues that the government presented "no evidence" of this theory because "Cheng had no recollection of being asked to sign it, and Teoh did not witness any attempt by Mr. Dines to have Cheng sign the document." Def.'s Suppl. Br. to Mot. for J. of Acquittal at 19.

14

Dines further argued at trial that, under either theory of guilt, Dines's actions could not have had the natural and probable effect of impeding the Coast Guard's investigation. Under the crewmember-count theory of guilt, Dines argues that even if he instructed Cheng to lie about the number of crewmembers and passengers, such an action "would not have had . . . a natural and probable effect of impeding a Coast Guard investigation because the charterer does not count as a member of the crew," and Cheng was the charterer. Trial Tr. Vol. III at 273. Dines contended that both Mr. Pope and Investigator Knapp testified that the charterer does not count as a passenger for the Coast Guard's passenger counts. *Id.* Under the contract theory of guilt, Dines argues that "a charter agreement does not have to be in writing," so getting Cheng to sign one after the incident also could not have had the natural and probable effect of impeding the marine casualty investigation. *Id.* at 274–75.

Finally, Dines argued that "there has been no evidence put forth that Mr. Dines's alleged actions were material to any Coast Guard investigation." Trial Tr. Vol. III at 275. Dines argues that the government must prove that the actions were material because the indictment alleges that Dines "encourag[ed] witnesses to provide false information material to [the Coast Guard] investigation." Indictment at 1–2.

The government responds in its supplemental brief that it presented sufficient evidence of both theories of guilt, either of which "independently meets the third element

of the section 1505 offense." Resp. in Opp'n to Def.'s Suppl. Br. at 10. The government argues that testimony from Coast Guard witnesses proved that "the number of passengers and crew impacts the licensing, vessel capacity, and safety of the vessel," and "impacts a determination of whether the vessel was operating within the rules" or as an illegal charter, all of which are "important components of a Coast Guard marine casualty investigation." *Id.* The government further points to Captain Patterson's testimony and the recorded phone call he had with Dines during which Dines told Patterson that exceeding the passenger limit by only one could be "chalked up to a mistake," which the Coast Guard might view as "understandable." *Id.* at 11 (quoting Gov't's Ex. 2 at 15:08–15:15).

Similarly, the government argues that "presenting the wrong contract to the passengers for signature" could have resulted in "the Coast Guard being presented with false, material information" because the contract contained inaccurate information about the charter. *Id.* at 13, 15. The government again points to the recorded phone call Dines had with Patterson during which Dines reasoned that "the Coast Guard unfortunately can only reason from the paperwork that's there." *Id.* at 15 (quoting Gov't's Ex. 2 at 12:49–12:54). The government points to the fact that Dines's employee, Larae Leeson, "emailed Cheng (cc'ing the defendant), a correct copy of the contract at 9:39 p.m.—less than twenty minutes after Cheng had taken a photo of the defendant's business card." *Id.* at 14. "The obvious inference is that once Cheng refused to sign the wrong contract, the defendant had

16

Leeson email Cheng a correct version in another attempt to have Cheng sign a contract, and thereby insulate the defendant and FYC Yachts from liability." *Id.*

As I instructed the jury, to meet its burden under this element, the government had to prove beyond a reasonable doubt that Dines acted "voluntarily, deliberately, and dishonestly with the specific intent to sway or change or prevent any action likely to be taken in the agency proceeding," and that "the natural and probable effect of the Defendant's acts would be to sway, change, or prevent some action likely to be taken in the agency proceedings." Jury Instructions at 18. Construing the evidence in the light most favorable to the government, a reasonable jury could find this element beyond a reasonable doubt.

As an initial matter, the government presented two theories of guilt, either of which standing alone could be sufficient to satisfy the third element. Thus, the government only needed to prove one of its theories of guilt beyond a reasonable doubt. Regarding the crewmember-count theory, Cheng testified that Dines approached him and asked if "there is any opportunity we can provide or have another crewmember in the group of 15 of us." Trial Tr. Vol. II at 138. He further explained that he tried to ask Dines "why should I be a crew member[?]" *Id.* Cheng is clearly not a native English speaker, and a reasonable jury could infer from his testimony that Dines intended to ask Cheng to pretend he or one of the others was actually a crewmember.

17

But this is not the only evidence that the government presented to support this theory. The government also presented testimony from three captains, each of whom Dines instructed to misrepresent the number of crewmembers on a charter if approached by the Coast Guard. *See* Trial Tr. Vol. I at 232–35, 251–52, 258; Trial Tr. Vol. II at 28–30. A reasonable jury could credit Cheng's testimony coupled with Dines's history of asking captains to misrepresent the number of passengers and find beyond a reasonable doubt that Dines asked Cheng to misrepresent his status as a crewmember to the Coast Guard in an attempt to obstruct the investigation.

Regarding the contract theory of guilt, Cheng testified that Dines found a charter agreement in Andrew Dillman's backpack and "gave it to me and I should – that I should kind of sign it." Trial Tr. Vol. II at 141. He confirmed that Dines "presented" the contract to him but that he "didn't sign that contract." *Id.* Larae Leeson sent him a different version of the charter agreement shortly after Cheng's conversation with Dines. *Id.* at 146. Although Cheng admitted on cross examination that his previous testimony was that Dines did not ask him to sign the agreement, a reasonable jury could still credit Cheng's testimony that Dines impliedly asked for a signature or, based on the circumstances that evening— including the subsequent email and the language barrier with Cheng—expressly asked for a signature.

The government offered significant evidence of Dines's intent through testimony from captains who previously worked for Dines and testified that he asked them to lie to the Coast Guard about the number of crewmembers aboard if they were ever boarded or investigated. *See* Trial Tr. Vol. I at 232–35, 251–52, 258; Trial Tr. Vol. II at 28–30. The government presented evidence that Dines knew that the Coast Guard was concerned with the number of crewmembers and passengers on a charter after he met with Investigator Knapp in August 2016. Trial Tr. Vol. II at 74, 77. Dines further demonstrated his understanding in the phone call he had with Captain Patterson when he acknowledged that the Coast Guard "only can reason from the paperwork." Resp. in Opp'n to Def.'s Suppl. Br. at 15 (quoting Gov't's Ex. 2 at 12:49–12:54). If Dines asked Cheng to sign an agreement after the incident, this provides strong evidence that Dines did so with the specific intent to mislead the Coast Guard in the course of their investigation.

The government also presented sufficient evidence that Dines's actions would have the natural and probable effect of impeding the investigation. Dines makes much of the fact that the Coast Guard had already arrived on the boat and counted the crewmembers and passengers by the time he arrived. But the government proved that the Coast Guard's marine casualty investigation was ongoing at the time that Dines spoke with Cheng, based on Office Gleason's testimony that the marine casualty investigation began with the forwarded 911 call at 6:10 p.m., and that it continued when he interviewed witnesses the

next day. Trial Tr. Vol. III at 17, 23. This undermines Dines's argument that the Coast Guard had already ascertained the crewmember count prior to Dines's arrival and that the count or information about the crew could no longer have been impacted by false statements from witnesses following Dines's conversation with Cheng.

Cheng's testimony also supports the government's theory. Cheng took a picture of Dines's business card at the end of their interaction at 9:11 p.m. That evidence along with Office Gleason's testimony that he arrived and began investigating around 9:20 p.m. shows that he could have spoken to Cheng after Cheng's conversation with Dines. Trial Tr. Vol. III at 17. A reasonable jury could conclude from this evidence that Dines's attempt to influence Cheng could have the natural and probable effect of impeding the Coast Guard's investigation. Even if Officer Gleason had already ascertained the number of crewmembers before Dines spoke to Cheng, he could have received conflicting information the next day from follow-up interviews with the passengers if they had done as Dines instructed.

Incorrect or misleading information about passenger and crewmember counts would have the natural and probable effect of impeding the Coast Guard investigation. Officer Gleason testified that the Coast Guard is concerned about the passenger/crewmember count because "depending on the number of passengers that are onboard, it changes the type of requirements for the vessel while they have passengers onboard." Trial Tr. Vol. III at 15. Gleason might have had to interview more witnesses or may have been unable to

determine whether the *Jaguar* was operating as an illegal charter because the number of crew and passengers is relevant to the Coast Guard's determination of these issues during an investigation. *See id.* at 15, 20–23, 26–27. Thus, the government presented sufficient evidence such that a reasonable jury could find beyond a reasonable doubt that Dines acted corruptly and with the specific intent of obstructing, impeding, or influencing an ongoing Coast Guard proceeding when he spoke with Cheng.

Finally, Dines's argument that the government failed to prove materiality is misplaced. Section 1505 does not require the government to prove that Dines attempted to influence, obstruct, or impede the investigation by trying to obscure information that was material to the investigation. True, the indictment alleged that Dines violated § 1505 "by encouraging witnesses to provide false information material to" the Coast Guard's marine casualty investigation. Indictment at 1. I instructed the jury on a definition of materiality because the word appears in the indictment. At trial the government argued that this term is sufficiently explained through the "natural and probable effect" language of element three. Trial Tr. Vol. III at 68. I concluded that, because the nexus requirement requires only that "the jury instructions inform jurors that the government is required to prove beyond a reasonable doubt that the defendant corruptly took some action, the natural and probable effect of which would be to obstruct or impede the [Coast Guard proceeding], the nexus requirement has been adequately explained." *Brenson*, 104 F.3d at 1280. I

provided an additional definition of materiality in the jury instructions not because it is part of an essential element but because the defense requested it, the government did not object to its addition, and it did not "do any harm" to include the definition. *See* Trial Tr. Vol. IV at 41.

Even if the government was required to prove that the false information that Dines encouraged witnesses to provide to the Coast Guard was material to the investigation, it presented sufficient evidence to do so. Coast Guard officers Knapp and Coyne testified that passenger counts and information about what type of charter the boat was could impact the Coast Guard's determination of whether the charter was following relevant regulations or operating as an illegal charter. *See* Trial Tr. Vol. II at 66–72, 232–35; Vol. III at 15, 20–23, 26–27.

Construing the evidence in the light most favorable to the government, the government presented sufficient evidence that a reasonable jury could conclude that Dines was guilty of obstructing a Coast Guard proceeding in violation of 18 U.S.C. § 1505. Dines's renewed motion for judgment of acquittal under Rule 29(a) is denied.

### B. Rule 29(c) Motion

Dines argues that the government failed to prove beyond a reasonable doubt any of the three elements of the charge. He further contends that the government presented no evidence of Dines asking Cheng to sign an agreement or to lie about being a crewmember,

and that Dines's actions could not have had the natural and probable effect of influencing the Coast Guard investigation. Def.'s Mot. for J. of Acquittal (Doc. 177) at 1–2. Dines then reiterates the arguments he made in his previous motions for judgment of acquittal, that the government failed to present sufficient evidence to prove any of the essential elements. *See id.* at 7–21.

The government responds in opposition that it presented sufficient evidence of two theories of guilt. *See* Resp. in Opp'n (Doc. 179) at 1. The government also responds that Dines's actions had the natural and probable effect of impeding the investigation because the Coast Guard had previously warned Dines about the importance of not overcrowding charters. *Id.* at 13. The government contends that "having one less passenger onboard [the *Jaguar*] may well have caused the Coast Guard to conclude there was no violation or just an inadvertent mistake." *Id.* at 13–14. And "[a]s the Coast Guard officials testified, the number of crew and ratio of crew to passengers on a vessel is significant, particularly during an emergency, as it affects the vessel's capabilities." *Id.* at 14–15. Thus, the government argues, a reasonable jury could find beyond a reasonable doubt that the natural and probable effect of instructing Cheng to lie about being a crewmember would be to impede the marine casualty investigation.

Dines's arguments are unavailing. As I explained above, the government presented sufficient evidence for a reasonable jury to find proof of each essential element beyond a reasonable doubt. Dines's motion for judgment of acquittal under rule 29(c) is denied.

## IV.   CONCLUSION

Because the government presented sufficient evidence for a reasonable jury to find Dines's guilt beyond a reasonable doubt for each essential element, I will not disturb the jury's guilty verdict. It is therefore ordered:

1.   Dines's renewed motion for judgment of acquittal under Rule 29(a) (Doc. 156) is **DENIED**.

2.   Dines's motion for judgment of acquittal under Rule 29(c) (Doc. 177) is **DENIED**.

**ORDERED** in Tampa, Florida, on April 4, 2023.

Kathryn Kimball Mizelle
United States District Judge